# BUNDREN *v.* STATE.

## (*Knoxville.*    September Term, 1902.)

**1.  BILL OF EXCEPTIONS.  No power in ex-clerk to file.**

After the expiration of his term of office, a clerk of the circuit court or trial court has no power to file or indorse as filed a bill of exceptions, and such an act by him is wholly unwarranted and illegal and will not permit the consideration of a bill of exceptions, so styled in the record, upon an appeal to this court.  (*Post, pp.* 227-230.)

**2.  SAME.  Semble.**

A clerk of the circuit court has no power to file a bill of exceptions save during the trial term of court or *within* the time allowed by an order of the court, authorized by the act of 1899, ch. 275.  (*Post, pp.* 227-230.)

**3.  SAME.  A nullity unless filed—Rule reaffirmed.**

It is a well settled rule in this State that unless the record affirmatively shows that the bill of exceptions was filed in the court below, no consideration will be given by this court to that part of the record purporting to be the bill of exceptions, it will be treated as a nullity and no error can be based thereon.  (*Post, pp.* 229-230.)

Cited and approved:  Bettis *v.* State, 103 Tenn., 339; Muse *v.* State, 106 Tenn., 183; Jones *v.* Moore, 106 Tenn., 188; Wright *v.* Redd, 106 Tenn., 719.

**4.  SAME.  Presumption in absence of—Rule reaffirmed.**

It is also well settled in this State that in the absence of a bill of exceptions the presumption is indisputable that, the conclusion reached by the jury is that which the evidence justified and required.  (*Post, p.* 230.)

Cited and approved:  Scruggs *v.* Heiskell, 95 Tenn., 455; Pratt *v.* Gillespie, 97 Tenn., 217; Daniel *v.* Coal Company, 105 Tenn., 471.

Cates 1-8

5. **MURDER.** Verdict of, supported by facts.

The facts set out in the opinion of the court abundantly support the verdict of guilty of murder in the first degree and negatives the plea of self-defense. (*Post, pp.* 230-236.)

FROM GRAINGER.

Appeal in error from Circuit Court of Grainger County. W. R. HICKS, Judge.

W. A. OWENS and H. Y. HUGHES, for Bundren.

CHARLES T. CATES, JR., Attorney-General and D.D. ANDERSON, for State.

MR. JUSTICE WILKES delivered the opinion of the Court.

Defendant, Bundren, is convicted of the murder of Jno. H. Crozier, Jr., and sentenced for life, and has appealed.

The first question presented to the court is whether there is in the record any bill of exceptions, such as the court can consider?

On the 7th of December, 1901, the judgment of the court below in the cause was pronounced, and the defendant prayed an appeal, which was granted, and on motion of his attorney he was allowed thirty days in which to prepare and file his bill of exceptions.

It did not appear from the original transcript that the bill of exceptions was ever filed in the case, though

Bundren v. State.

what purports to be a bill of exceptions appears in the record without any indorsement showing that it was ever filed, so as to become part of the record.

This fact having been called to the attention of the court during the argument of the case, on motion of the defendant's attorney, a suggestion of diminution was allowed to be and was made, and the clerk was ordered to send up a perfect bill of exceptions, showing whether the same was filed, when filed, and the date of filing by him.

In response to the writ suggesting the diminution, a paper was filed in this court purporting to be signed R. B. Harrison, by H. G. Farmer, deputy, certifying that the bill of exceptions was signed by the trial judge, December 19, 1901, and that it was received and filed by his predecessor in office, C. B. Brewer, on the twenty-third day of December, 1901, as the same appears of record in his office.

This certificate bears date of November 7, 1902. Accompanying this certificate are two affidavits,—one by C. B. Brewer, former clerk, and predecessor of R. B. Harrison, the present clerk; and one by H. G. Farmer, the deputy of the present clerk.

The former states that he was clerk when the case was tried in the court below, and prepared the transcript of Bundren against State for the supreme court; that the bill of exceptions was filed with him on Sunday, December 22, 1901, and that it was marked filed December 23, 1901, the indorsement of filing

being in pencil; and that by continued use and hand-
ling of the bill of exceptions, or by some other means,
unknown to affiant, the filing has become obliterated
or erased; that by instructions from the present
deputy clerk on November 7, 1902, he made certificate
to the date on which said bill of exceptions was filed.
The date of filing being erased, he marked it as filed
on December 23, 1901.

This affidavit is made on November 8, 1902.

The other affidavit, by H. G. Farmer, the deputy of
the present clerk, was made the same day, and states,
in substance: That he had control of the office since
October 9, 1902; that he was absent from the office
on November 7, 1902; that Jas. H. Bundren called
him by phone from Rutledge at Joppa, in Grainger
county, and requested him to authorize C. B. Brewer,
ex-circuit court clerk, to certify to a certain date in
the bill of exceptions in the case of the State against
R. B. Bundren, and that he authorized said Brewer
to certify to any thing that was legal in his name;
that he was not informed as to what date, or what
it was they desired certified, but that he has since
been informed by the attorney-general for the State
that a certificate had been made to the effect that the
bill of exceptions was indorsed, "Filed Dec. 23, 1901,"
which he (Farmer) did not make, but it was made
by said C. B. Brewer. He further swears that the
bill of exceptions was not marked "Filed Dec. 23,

1901," previous to November 7, 1902, or marked filed on any date to his knowledge.

He further swears that C. B. Brewer had said to him on that day, November 7, 1902, that he indorsed on said bill of exceptions "Filed Dec. 23, 1901," on November 7, 1902; because he had on December 23, 1901, marked said bill of exceptions filed with a lead pencil, and that his indorsement of filing had in some way been erased.

He further swears that said bill of exceptions is not marked filed on the State rule docket in his office, and that his affidavit is made at the request of the attorney-general of the State.

It is only necessary to say that it fully appears from these certificates and affidavits that, after the suggestion of diminution in this court, C. B. Brewer, the former clerk of the court when the Bundren case was tried and the record made up, but who has since retired from office, on November 7, 1902, made an indorsement upon the original bill of exceptions in the court below in the following words, "Filed Dec. 23, 1901," and that this indorsement was not upon the original bill of exceptions at that time. This indorsement he made on the ground that he had previously, and on December 23, 1901, made it, and it had by some means been erased. This act of said Brewer was wholly unauthorized, and illegal and unwarranted. And the indorsement goes for naught, and as if it had never been made; so that the legitimate record

as it comes to this court does not show that what purports to be the bill of exceptions was ever filed in the court below in the cause, or that it was made a part of the record. It is, therefore, a nullity, and no errors can be based upon it. *Bettis* v. *State,* 103 Tenn., 339 (52 S. W., 1071); *Muse* v. *State,* 106 Tenn., 183 (61 S. W., 80); *Jones* v. *Moore,* 106 Tenn., 188 (61 S. W., 81); *Wright* v. *Redd Bros.,* 106 Tenn., 719 (63 S W., 1120).

In the absence of a bill of exceptions, the presumption is indisputable that the conclusion reached by the jury, is that which the evidence justified and required. *Scruggs* v. *Heiskell,* 95 Tenn., 455 (32 S. W., 386); *Pratt* v. *Gillespie,* 97 Tenn., 217 (36 S. W., 1097); *Daniel* v. *Coal Co.,* 105 Tenn., 471 (58 S. W., 859).

But, inasmuch as the liberty of the defendant for life is involved we have gone carefully through the record to ascertain whether the merits of the case have been reached, and whether the defendant is guilty of the crime of which he has been convicted, in order that in a matter so serious he may not be precluded by the misprison of the clerk in failing to file the bill of exceptions as he should. It appears from the record that Crozier was an attorney, and had in his hands for collection from the defendant a judgment, upon which he had caused execution to issue and to be levied upon some saw logs belonging to the wife of defendant. She replevined these logs, and there was

a counter replevin; the logs all the while being at Long's Mill.

On July 2, 1900, Crozier, Long and Holland were engaged in dividing these logs, when Bundren appeared, and warned them to desist. Holland, during the progress of the litigation between the parties, had bought an interest in the logs. Defendant, when he came upon the scene, cursed Holland, and immediately thereafter pulled his pistol, and fired three shots at Crozier, who was sitting, unarmed, upon a log.

Crozier fled into the mill, and as he ran defendant fired two more shots at him. Crozier then ran into the woods, and defendant, after reloading his pistol, followed, and searched for him, but did not find him, and thereupon returned to the mill, and rode off home, a distance of a mile and a half or two miles. None of the shots took effect. When they were fired, defendant had not spoken to Crozier, nor Crozier to the defendant, and the former was sitting on a log, leaning forward, and looking either at a small book or a piece of bark which he had in his hand.

Previous to this difficulty, at one of the trials before the justice of the peace, the defendant attended with his Winchester rifle, and so demeaned himself that the deceased asked the justice to place him under bond to keep the peace. On another occasion defendant said to Mr. Monroe that, whatever he had, was subject to execution, but that Crozier could not take his wife's property to pay his debts, law or no

law, and, if he undertook to do so, he would take his gun and blow his brains out, or shoot his head off. This is admitted by the defendant. After the difficulty at the mill, and defendant had gone home, Crozier returned from the woods to the mill, and, after stopping awhile, left in the direction of Jno. Henry's house, where he boarded and lived. The road from the mill to Henry's passed by the house of E. P. Riddle.

On the evening of the same day, and about three hours after the difficulty at the mill, defendant went to the house of Riddle. His version of his conduct after the difficulty at the mill is that he went home, and told his family about the shooting at the mill; that he feared Crozier would raise a crowd, and kill him, and that it was best to leave the country; and that he went by Riddle's intending to cross the river near there, and go into Kentucky; that when he was at Riddle's the latter called his attention to the fact that Crozier was coming down the road from the mill, and he thereupon concluded that it was safer to fight it out than to try to escape; that he thought Crozier had a pistol in his hand, concealed by a handkerchief; that Crozier attempted to climb over the fence, and either jumped or fell off, and either sat down or fell down in the road, keeping his hand with the handkerchief in front of him; and he shot in self-defense, expecting every moment to be shot by a pistol in Crozier's hand.

After shooting Crozier, he returned home, remained there a day or two, then went to Claiborne county, and afterwards surrendered to the sheriff.

This is, in substance, his version of the affair.

Witness, George Ryan, saw him as he left his gate on the way to Riddle's, armed with his Winchester rifle, and was told by him he had shot at defendant at the mill; that he had been bothered by Crozier, but that he would not bother him any more. He left, going in the direction of Riddle's.

He was seen by witness Gilbert going towards Riddle's, riding, and with his Winchester rifle across his lap.

He afterwards saw defendant as he was returning from Riddle's, and was told by him that he had killed Crozier, who had been lawing him. Witness went down to Riddle's, and found Crozier dead on the ground in the road, with his handkerchief in his right hand. He was unarmed, but had wounds in his breast and in the calf of his leg.

The road upon which defendant went to Riddle's and the one by which Crozier was going from the mill to his home at Henry's, crossed each other at Riddle's home, and was about two miles from defendant's home.

Riddle says that defendant came towards his home, and stopped at the corner of the fence where the two roads intersect, and called witness to him, and told him that he had made arrangements to pay him the

note he owed him. He then asked witness if he had seen Crozier or Holland, and told him about the shooting at the mill. While they were talking, Crozier appeared, coming along the road from the mill, walking in company with Jno. Hipshire, who was riding. Defendant was then about ten or twelve feet from the corner of the fence at the intersection of the two roads, and was on his horse. Witness remarked to defendant, "Yonder comes Crozier now." Thereupon defendant leaned forward on his horse so as to look under some intervening limbs which interfered with his sight of the road, and, when he saw Crozier, said "he would get down and finish him." He then dismounted, and walked out into the intersection of the two roads.

Crozier was approaching with a white handkerchief in his hand, which was up, and his arm at right angles with his body.

When he saw defendant, he passed behind Hipshire's horse; crossed the road; said, "Don't shoot;" tried to climb the fence, but must have slipped off; fell into the road; and while he was lying in the road defendant shot him twice, killing him. The handkerchief was still in Crozier's hands after he was killed. He was not armed, and said nothing except to ask defendant not to kill him.

Hipshire came with Crozier from the mill to Riddle's, he riding and Crozier walking. Saw Bundren get off his horse, and go out into the center of the

road, and walk down into the mouth of the road he and Crozier were in. Saw defendant take aim and fire. Heard deceased say just before the firing, "Bloof, don't shoot; you have got the advantage of me." Crozier had handkerchief in his hand. Defendant said nothing. After the shooting, witness said to defendant, "You ought not to have done it," to which defendant replied "that he had told him or sent him (Crozier) word to let him alone, and that he wouldn't do it, but he guessed he would now." Crozier was not armed. Nicely, (another witness) corroborates Riddle and Hipshire, and heard Crozier say, "You have the advantage of me."

Defendant told Dicey Green, (another witness) about the shooting, and said, "Now I reckon the damn rascal will quit bothering me, and stay out of my face." He also heard defendant, before the shooting, make threats against deceased.

Witness Devault, for the defense, states that he heard Crozier say "he wanted to catch Bundren unarmed; that he had been acting rascally, and he would fix him before he got through with him." He told the defendant of this conversation.

Witness Walter Goin says he had a talk with Crozier, in which he said he was not yet ready to kill defendant; that he meant to law him till he broke him up, and then he would kill him; and he says he told defendant of this conversation. This witness is impeached, and is entitled to but little, if any, credit.

Long and Taylor testify that Crozier's character was that of a bad and dangerous man.

Shockley states that Crozier said he would whip defendant with the law, and that, if he could not do it one way, he could another.

This is substantially all the evidence in the case.

There is no objection to the charge of the court as given. Several errors are assigned, all of which we have carefully examined. They are all more or less technical. None of them go to the merits of the case. The evidence in the case amply sustains the verdict. The guilt of the defendant is clear and conclusively shown.

The judgment of the court below is affirmed, with costs.

The clerk of this court will issue a writ to attach the person of C. B. Brewer, returnable to the first day of the next term of this court, to answer the charge of contempt for an illegal and unwarranted interference with the record in the cause, and the attorney-general is directed to prosecute him for such contempt.